**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------------X
PUERTO RICO GOVERNMENT JUDICIARY          :
EMPLOYEES RETIREMENT SYSTEM               :
ADMINISTRATION, CRAIG B. LAUB, J.D.       :
PISUT and SANDRA REDFERN,                 : 15 Civ. 01938 (DAB)
                                          :
                    Plaintiffs,           :
                                          :
         -against-                        :
                                          :  Amended Class
                                          :  Action Complaint
                                          :
                                          :  ECF Case
                                          :
MARCUM, LLP, as successor to STONEFIELD   :
JOSEPHSON, INC.,                          :  Jury Trial Demanded
                                          :
                    Defendant.            :
----------------------------------------------------------------------X
```

Plaintiffs the Puerto Rico Government Judiciary Employees Retirement System Administration, Craig B. Laub, J.D. Pisut and Sandra Redfern (collectively, the "PR Group" or "Plaintiffs", allege the following based upon the investigation of its counsel, which included, among other things: a review of documents produced by non-party Fuqi International, Inc. ("Fuqi" or the "Company"), information provided by current and/or former employees of the Company, Fuqi's public documents, media reports, United States Securities and Exchange Commission ("SEC") filings, wire and press releases regarding the Company and securities analysts' reports and advisories about Fuqi. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a federal class action on behalf of purchasers (the "Class") of the common stock of Fuqi, who purchased or otherwise acquired the Company's common

stock between May 15, 2009 and March 27, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.  The Class also includes persons or entities who purchased or otherwise acquired stock pursuant or traceable to the Company's stock offering on or about July 22, 2009 (the "Secondary Offering" or the "Offering"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").  The claims brought pursuant to the Securities Act are separate from the claims brought pursuant to the Exchange Act, and assert different allegations and legal standards from those asserted in connection with the Exchange Act claims.

2.     On July 22, 2009, Fuqi's Secondary Offering was declared effective by the SEC in which it was to sell 4,855,000 shares of common stock at a price of $21.50 per share, raising more than $104.3 million.  The underwriters in the Secondary Offering exercised their over-allotment and purchased and sold an additional 726,395 shares at $21.50 per share for total proceeds to Fuqi of approximately $112.4 million.

3.     As stated below, Defendant Stonefield (defined below) gave its consent to allow Fuqi to incorporate by reference into Fuqi's Registration Statement (defined below) in connection with the Secondary Offering, Fuqi's consolidated financial statements for each of the years in the three-year period ended December 31, 2008, as well as Stonefield's determinations concerning the effectiveness of the Company's internal control over financial reporting as of December 31, 2008, which was included in Fuqi's Form 10-K for the year ended December 31, 2008 filed with the SEC on March 31, 2009 (the "2008 10-K").  Stonefield provided such consent without conducting proper due diligence from the time of its audit in connection with the 2008 10-K until the time of the

Registration Statement, if it conducted any due diligence at all.   As subsequently revealed, Fuqi's announced results for the first quarter of fiscal year 2009 were materially misstated, required restatement and could not be relied upon, and the Company's internal controls were virtually nonexistent.   When this information was revealed to the public, Fuqi's stock price dropped precipitously.

4.      Non-party Fuqi is a designer of high quality precious metal jewelry in China, developing, promoting, and selling a broad range of products to the luxury goods market in China. The Company's products consist of a range of unique styles and designs made from gold and other precious metals such as platinum and Karat gold (K-gold). The Company also produces jewelry items that contain diamonds and other precious stones on a custom-order basis.

5.      During the first three quarters of 2009, Fuqi reported significant financial growth and increased profitability.  For example, the Company boasted increases in gross profits as a percentage of revenues of 5.15%, 6.60%, and 11.8% for the quarters ended March 31, 2009, June 30, 2009, and September 30, 2009, respectively.  Likewise, Fuqi reported increases in net income as a percentage of revenues of 0.59%, 1.93%, and 7.80%, respectively, for the same periods.

6.      Based on the Company's financial performance, various analysts and market commentators repeatedly touted the Company's stock as one of "5 Stocks Approaching Greatness" and one of "China's Undiscovered Gems."  As a consequence of Fuqi's publicly reported financial success, the price of the Company's common stock rose dramatically during the Class Period.   For example, on May 15, 2009, the

Company's common stock closed at $7.61 per share.  During the Class Period, Fuqi's stock closed as high as $31.86 per share.

7.      Subsequent to the Offering, on November 9, 2009, the market began to question the Company's ability to sustain its apparent success after Fuqi disclosed that growth in its wholesale business had declined approximately 10%.  Moreover, to the extent Fuqi reported financial results in conformity with estimates, it only met those estimates through an unusually high recognition of high margin original design manufacturing revenue, which had gross margins higher than the Company's historical gross margins for its wholesale business.  Thus, analysts questioned the quality of Fuqi's earnings.  Indeed, analysts such as Merriman Curhan Ford expressed concern about the Company's results and the price of Fuqi common stock declined 17.79%, or $4.15 per share, to close at $19.18 per share on unusually heavy volume.

8.      The full extent of the problems at Fuqi would not be disclosed, however, until the end of the Class Period.  Unbeknownst to the investing public, Fuqi suffered from inadequate internal financial controls that caused the Company to report materially false financial results during the Class Period.  In addition, Fuqi's financial control deficiencies were so pervasive that the Company would ultimately disclose that it had engaged in unauthorized cash transfers of approximately $135 million to unrelated third parties.  As a result, the Company shocked the market when, on March 16, 2010, it announced that: (1) it was conducting an internal assessment of its internal controls as of December 31, 2009; (2) it was unable to timely file its annual report for 2009 with the SEC due to certain accounting errors caused by a material weakness in its internal controls during 2009; and (3) investors should no longer rely upon the Company's

previously issued financial statements for the periods ending March 31, 2009, June 30, 2009, and September 30, 2009.

9.      On this news, shares of the Company's stock declined more than 35%, from a close of $19.00 per share on March 16, 2010, prior to announcement of the Company's accounting errors and internal control deficiencies, to a close of $11.90 per share on March 17, 2010, the first full trading day after the announcement, on extremely heavy trading volume.  Plaintiff and the other members of the Class who purchased shares of Fuqi common stock at artificially inflated prices, and in ignorance of the truth, were damaged thereby.

10.     In addition, members of the Class who purchased Fuqi common stock pursuant to the materially false Registration Statement, and Prospectus incorporated therein, issued in connection with the Secondary Offering, were damaged thereby.

11.     Further, on March 28, 2011, the Company disclosed that it had engaged in the above-referenced unauthorized cash transfers.  Fuqi and Yu Kwai Chong, Fuqi's President, Chief Executive Officer, and Chairman of the Board during the Class Period, subsequently entered into a consent decree with the SEC as a consequence of the cash transfers which provided for the payment of $1 million and $150,000 in civil penalties imposed upon the Company and Chong, respectively.  In addition, Chong agreed to a bar order that prevents him from serving as an officer or director of a public company for five years.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Section 11 of the Securities Act (15 U.S.C. §§ 77k), and under and pursuant to Section 10(b) of the

Exchange Act, (15 U.S.C. §§ 78j(b) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and 28 U.S.C. § 1331.

14.     Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act and pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).   Additionally, the Company's Secondary Offering was actively marketed in this Judicial District.

15.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendant, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.     The members of the PR Group (the Puerto Rico Government Judiciary Employees Retirement System Administration, Craig B. Laub, J.D. Pisut and Sandra Redfern) purchased Fuqi common stock at artificially inflated prices during the Class Period and have been damaged thereby.  PR Group member, the Puerto Rico Government Judiciary Employees Retirement System Administration, also purchased Fuqi common stock in the Secondary Offering pursuant to a Registration Statement containing materially false and misleading statements, and was damaged thereby.

17.     Defendant Marcum, LLP ("Marcum") is the successor to Stonefield Josephson, Inc. ("Stonefield"), following an October 2010 merger.  Prior to the merger, Marcum described itself as: "one of the largest independent public accounting and advisory services firms in the nation. Ranked 15th among the 'Top 100 Firms' by Inside Public Accounting, Marcum offers the resources of more than 1,100 professionals, including 150 partners, in 21 offices throughout New York, New Jersey, Connecticut, Pennsylvania, Florida, Massachusetts, California, Hong Kong and Grand Cayman."  Prior to its merger with Marcum, Stonefield was a California-based certified public accounting and advisory firm, servicing public and privately-held clients throughout the United States and internationally from its offices in Los Angeles, Orange County, San Diego, San Francisco, San Jose, and Hong Kong.

18.     According to a press release, dated October 4, 2010, "[t]he merger marks Marcum's expansion to the West Coast and is a critical step in the firm's aggressive growth strategy in major markets throughout the nation."  That same press release further stated that the "entire 150 members of the Stonefield Josephson, Inc. team will join Marcum."   Following the merger, Marcum offered an extensive range of professional services and a high degree of specialization.   In addition to traditional accounting, assurance and tax, including domestic and international tax planning and preparation, Marcum's professional services include mergers and acquisition planning, family office services, forensic accounting, business valuation and litigation support. Marcum has developed several niche practice areas serving private equity partnerships; hedge funds; SEC registrants; real estate; government, public and not-for-profit sectors;

manufacturing; construction; healthcare; and bankruptcies and receiverships; as well as a China specialty practice.

19.     In a Form 8-K, filed with the SEC on October 7, 2010, Fuqi reported that its Audit Committee had approved MarcumStonefield, a division of Marcum LLP, as the Company's independent auditor effective October 1, 2010.  In a Form 8-K/A, dated November 4, 2010, Fuqi clarified that the name of its independent auditor following the merger of Stonefield and Marcum was Marcum LLP.  Thus, throughout the Class Period and in connection with the Secondary Offering, Stonefield and, subsequent to its 2010 merger, Marcum, served as the independent outside auditor for Fuqi.

20.     References herein to "Stonefield" refer to Stonefield as well as its post-merger successor entity Marcum.

21.     In the Company's registration statement filed with the SEC in connection with the Secondary Offering (the "Registration Statement") on Form S-3 (the "Form S-3"), Stonefield consented to the incorporation by reference of Fuqi's consolidated financial statements for each of the years in the three-year period ended December 31, 2008, as well as the incorporation by reference of the statements regarding the effectiveness of the Company's internal control over financial reporting as of December 31, 2008, included in Fuqi's 2008 10-K filed with the SEC on March 31, 2009. Also incorporated by reference in the Form S-3 was Fuqi's quarterly report on Form 10-Q for the three months ended March 31, 2009.  Specifically, Stonefield included the following Consent of Independent Registered Public Accounting Firm within the Company's Registration Statement:

We hereby consent to the incorporation by reference in this Registration Statement on Form S-3 of Fuqi International, Inc. of our reports dated March 30, 2009 relating to the audits of consolidated financial statements and schedules as of December 31, 2008 and 2007 and for each of the years in the three-year period ended December 31, 2008 and the effectiveness of internal control over financial reporting as of December 31, 2008 included in Fuqi International, Inc.'s Form 10-K for the year ended December 31, 2008 filed on March 31, 2009.

We also consent to the reference of our firm under the caption "Experts" in the Prospectus, which is part of this Registration Statement.

/s/ Stonefield Josephson, Inc.
CERTIFIED PUBLIC ACCOUNTANTS

Wanchai, Hong Kong
July 30, 2009

## **NON-PARTIES**

22.     Non-party Fuqi is a Delaware corporation with its principal executive offices located at 5/F, Block 1, Shi Hua Industrial Zone, Cui Zhu Road North Shenzhen, 518019, People's Republic of China.  The Company's common stock traded on the NASDAQ Stock Exchange until it was delisted on or about March 29, 2011. Fuqi operates through its wholly-owned subsidiary, Fuqi International Holdings Co., Ltd., a British Virgin Islands corporation ("Fuqi BVI") and its wholly-owned subsidiary, Shenzhen Fuqi Jewelry Co., Ltd., a company established under the laws of China ("Fuqi China").

23.     Yu Kwai Chong ("Chong") was, at all relevant times, President, Chief Executive Officer, Chairman of the Board, and majority shareholder of Fuqi.  According to the Company's 2009 Proxy Statement, filed with the SEC on Schedule 14A on April 30, 2009 (the "2009 Proxy Statement"), Chong is the principal founder of the Company and is involved in Fuqi's day-to-day operations with responsibility for the strategic planning, marketing and overall growth of the Company.  Chong signed the Company's

interim reports for the periods ending March 31, 2009, June 30, 2009, and September 30, 2009, filed with the SEC on Forms 10-Q, as well as the Company's certifications of compliance with the requirements of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley" or "SOX") for the same periods. As a director of the Company, Chong signed the Company's Registration Statement filed with the SEC on Form S-3 and declared effective on July 22, 2009, pursuant to which the Secondary Offering was conducted.

24.     Ching Wan Wong ("Wong") was, at all relevant times, Chief Financial Officer and a director of Fuqi.  Wong is a Certified Practicing Accountant in Australia, a Certified Public Accountant ("CPA") in Hong Kong, China and a Certified General Accountant in Canada.  According to the 2009 Proxy Statement, Wong is experienced in international financial reporting and management. Wong signed the Company's interim reports for the periods ending March 31, 2009, June 30, 2009, and September 30, 2009, filed with the SEC on Forms 10-Q, as well as the Company's certifications of compliance with the requirements of the Sarbanes-Oxley for the same periods.  Wong signed the Registration Statement as a director of the Company.

25.     Eileen B. Brody ("Brody") was, at all relevant times, a director of Fuqi and member of the Fuqi Board of Directors' Audit Committee (the "Audit Committee"). According to the Company's 2009 Proxy Statement, from 1983 to 1990, Brody worked for KPMG Peat Marwick in various positions, including as a Senior Manager, and was responsible for audit services for a diverse clientele of large Fortune 500 companies, as well as small publicly traded companies, providing due diligence services on a wide variety of acquisitions.  Brody is a CPA who signed the Registration Statement as a director of the Company.

26.     Victor A. Hollander ("Hollander") was, at all relevant times, a director of Fuqi and member of the Audit Committee.  According to the 2009 Proxy Statement, Hollander is a CPA, and while employed at Brout & Company, was the audit partner for many public companies listed on the New York Stock Exchange and the American Stock Exchange.   According to the 2009 Proxy Statement, Hollander has served on the Securities, Ethics and Accounting and Auditing Committees of various organizations, including the American Institute of Certified Public Accountants and California State Society of Certified Public Accountants, as well as having served as a director, including as Chair of the audit committee, of several SEC reporting companies. Hollander signed the Registration Statement as a director of the Company.

### PLAINTIFF'S CLASS AND SUBCLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Fuqi common stock between May 15, 2009 and March 27, 2011, inclusive, seeking to pursue remedies under the Exchange Act.  Excluded are Defendant, any entity in which the Defendant has or had a controlling interest or is a parent or subsidiary of, or is controlled by, Stonefield, and the partners, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant. Plaintiff also brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Subclass, consisting of all those who purchased or otherwise acquired Fuqi common stock pursuant or traceable to the Secondary Offering, seeking to pursue remedies under the Securities Act.  Excluded are Defendant, any entity in which the Defendant has or had a controlling interest or is a parent or

subsidiary of, or is controlled by, Stonefield and the partners, employees, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant.

28.     The members of the Class are so numerous that joinder of all members is impracticable.  There were 22,005,509 shares of common stock outstanding as of March 31, 2009.  The members of the Subclass are also so numerous that joinder of all members is impracticable.  There were 4,855,000 shares of common stock sold in the Secondary Offering.   While the exact number of Class and Subclass members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class and in the Subclass.  Record owners and other members of the Class and Subclass may be identified from records maintained by Fuqi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

29.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendant's wrongful conduct in violation of federal law that is complained of herein.  Plaintiff's claims are also typical of the claims of the members of the Subclass as all members of the Subclass are similarly affected by Defendant's wrongful conduct applicable to the Subclass in violation of federal law that is complained of herein.

30.     Plaintiff will fairly and adequately protect the interests of the members of the Class and the Subclass and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class or the Subclass.

31.    Common questions of law and fact exist as to all members of the Class and Subclass and predominate over any questions solely affecting individual members of the Class or the Subclass. Among the questions of law and fact common to the Class and Subclass are:

(a)    whether the federal securities laws were violated by Defendant's acts as alleged herein;

(b)    whether statements made by the Defendant to the investing public during the Class Period misrepresented material facts about the business, operations and financial results of Fuqi; and

(c)    to what extent the members of the Class and Subclass have sustained damages and the proper measure of damages.

32.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class or Subclass members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class or Subclass to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.


**FUQI'S 2008 10-K**

33.    Stonefield was the auditor for Fuqi's 2008 10-K and it audited Fuqi's financial statements and internal control over financial reporting.  Stonefield found,

among other things, that Fuqi's financial statements were presented in conformity with accounting principles generally accepted in the United States ("GAAP").

34.    In its annual report for 2008, filed with the SEC in its 2008 10-K, Fuqi described itself as:

> a leading designer of high quality precious metal jewelry in China, developing, promoting, and selling a broad range of products to the luxury goods market in China. Our products consist of a range of unique styles and designs made from gold and other precious metals such as platinum and Karat gold (K-gold).  We also produce jewelry items that contain diamonds and other precious stones on a custom-order basis. Our design database presently contains over 30,000 unique products. We continuously innovate and change our designs based upon consumer trends in China. By continuously creating new designs and rapidly bringing them to market, we believe we are able to differentiate ourselves from our competitors and strengthen our brand identity.

35.    In the 2008 10-K, Fuqi reported that 97% of its revenues in 2008 was attributable to sales to the wholesale market, but that the Company was expanding into the retail market.  The Company reported that it believed such expansion would enable it to, among other things, grow its revenue base and improve net margins from higher markups in the retail market.  The Company further explained that the opportunity to expand into the retail market was a consequence of the expansion of China's market for jewelry and other luxury goods due, in part, to the country's rapid economic growth. According to Fuqi's 2008 10-K, economic growth in China had led to greater levels of personal disposable income and increased spending among China's expanding middle-class consumer base.  The Company stated:

> China—with its 1.3 billion consumers, higher minimum wages, expanded welfare payments, and reduced income taxes—is the world's third-largest consumer of luxury goods.  China's younger generations, in particular, have bought into consumerism more than their predecessors and been lured by flashy products and high-end merchandise marketed to the

wealthy, upper-middle and middle-market consumers. The jewelry industry in China has grown at an annual rate of approximately 10 percent since the 1980's and is expected to be the largest market in the world by 2010.  In 2005, domestic sales of jewelry in China amounted to RMB 140 billion, which is approximately US$19.8 billion, and the industry earned $5.49 billion worth of foreign exchange for China through exports.  In 2008, the growth in China's jewelry industry was higher than its general economic growth. As a result, China became the second largest gold consumer and the largest platinum jewelry market in the world.

## THE COMPANY'S FIRST QUARTER 2009 RESULTS

36.     On May 15, 2009, Fuqi filed its quarterly report for the three month period ending March 31, 2009 (the "1Q 2009 10-Q") with the SEC.  In that Form 10-Q, Fuqi reported, *inter alia*, cost of sales of $82,632,955 (wholesale) and  $8,675,689 (retail) for the first quarter 2009; gross profit of $18,051,366 (compared to $8,811,375 for the same period in 2008); and net income of $9,660,499 (compared to $6,395,073 in 2008).  The 1Q 2009 10-Q was signed by Chong and Wong.

37.     Attached as exhibits to the 1Q 2009 10-Q were the certifications of Chong and Wong made pursuant to § 302(a) of Sarbanes-Oxley, in which they each certified:

1.     I have reviewed this report on Form 10-Q of Fuqi International, Inc.;

2.     Based on my knowledge, ***this report does not contain any untrue statement of a material fact*** or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal

control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.[1]

38.     In addition, attached to the 1Q 2009 10-Q was the Certification of Chief

Executive Officer and Chief Financial Officer pursuant to § 906 of the Sarbanes-Oxley,

---

[1]     Unless otherwise indicated, all emphasis is added.

executed by Chong and Wong, which, in pertinent part, provides that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

## THE OFFERING

39.     On or about July 22, 2009, Fuqi filed a Preliminary Prospectus Supplement with the SEC on Form 424B5.  On that same day, the SEC declared it effective.  On July 30, 2009, the Company filed a Final Prospectus Supplement with the SEC, on Form 424B5 (the "Prospectus"), to sell 4,855,000 shares of Fuqi common stock at a price of $21.50 per share, pursuant to the Registration Statement. The Secondary Offering also provided for an over-allotment of 675,000 shares.  In the Company's Form 10-Q for the second quarter of 2009, filed with the SEC on August 8, 2009, Fuqi reported "[o]n August 5, 2009, the Company closed a public offering of 5,581,395 shares of common stock at a price per share of $21.50, raising proceeds, net of underwriting discounts and commissions and estimated offering expenses, of approximately $112.4 million.  The shares issued in the offering include 726,395 shares issued pursuant to the underwriters' exercise of their over-allotment option."

40.     In the Prospectus, the Company reported summary financial data for the first quarter, ending March 31, 2009.  In that summary financial data, Fuqi reported cost of sales of $91,309,000; gross profit of $18,051,000; and net income of $9,660,000 for the first quarter of 2009.  In addition, the Prospectus expressly incorporated by reference the Company's 1Q 2009 10-Q.

41.     The cost of sales, gross profit and net income results for the first quarter of 2009 reported in the Prospectus were materially false and misleading because the

Company's internal controls were inadequate, resulting in accounting errors relating to inventory and costs of sales during the quarter.  The material deficiencies in Fuqi's internal controls caused the Company's cost of sales to be materially understated and the reported gross profit and net income to be materially overstated.  As the Company would subsequently disclose on March 16, 2010, the Company's previously issued financial statements for the three months ended March 31, 2009, which were summarized in the Prospectus, "should not be relied upon due to an error in the accounting of inventory and cost of sales."

42.     As noted above, Stonefield consented to the incorporation by reference in the Company's Registration Statement filed with the SEC in connection with the Secondary Offering on Form S-3 of Fuqi's consolidated financial statements for each of the years in the three-year period ended December 31, 2008, as well as the effectiveness of the Company's internal control over financial reporting as of December 31, 2008 included in Fuqi's 200810-K.

## **RELEVANT AUDITING STANDARDS**

43.     Section 11 of the Securities Act imposes significant responsibilities on every auditor who has with his or her consent been named as having certified any part of the registration statement. When an independent auditor's report is included in a registration statement, the nature and extent of this responsibility are specified in some detail in the federal securities statutes and in the related rules and regulations. Audit Standard ("AU") 711.02 states that §11(a) imposes responsibility for false or misleading statements in an effective registration statement, or for omissions that render statements made in such a document misleading on every auditor who consents to be named as

having certified any part of the registration statement, or as having prepared any report used in connection with the registration statement, with respect to the statement or reporting in the registration statement that purports to have been prepared or certified by the auditor.

44.     AU 711. 03 explains that § 11 (b) requires the purported expert to meet the burden of proof as to the portion of the registration statement made on the expert's authority or from an expert's report. The expert must show that "he had after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

45.     AU 711.03 also states that "Section 11 further provides that in determining what constitutes reasonable investigation and reasonable ground to believe, 'the standard of reasonableness shall be that required of a prudent man in the management of his own property.'"  Thus, this reasonableness requirement goes beyond the requirement of due professional care imposed by the auditing standards.

46.     One of the unique responsibilities related to the auditor's consent to the inclusion of an audit report in a registration statement is that the decision to consent should be made in light of the circumstances as of the effective date. AU 711.05 states as follows:

> Because a registration statement under the Securities Act of 1933 **speaks as of its effective date**, the independent accountant whose report is included in such a registration statement has **a statutory responsibility that is determined in light of the circumstances on that date**. This aspect of responsibility is peculiar to reports used for this purpose ....

*Id.* This requirement means that the auditor should view the continuing validity of the opinion expressed at an earlier date from the perspective of the circumstances known as of the effective date.

47. AU 711.10 describes the auditor's responsibility to keep informed of relevant circumstances through the effective date as follows:

> To sustain the burden of proof that he has made a "reasonable investigation" (see paragraph .03) as required under the Securities Act of 1933, an auditor should extend his procedures with respect to subsequent events from the date of his audit report up to the effective date or as close thereto as is reasonable and practical in the circumstances.

48. As described herein, for the purposes of issuing consent in a registration statement, AU 711 requires that an auditor view the continuing validity of an audit opinion expressed at an earlier date from the perspective of the circumstances known at the effective date of the Registration Statement. As shown below, by the time of the Secondary Offering, Stonefield was well aware of numerous red flags indicating that the Company's previously filed financial statements were materially false and misleading and, therefore, unreliable. Accordingly, under AICPA Professional Standards, Statements on Auditing Standards No. 37, § 711 (Am. Inst. Of Certified Pub. Accountants 1981), Stonefield had a duty to review the previously issued financial statements and either modify its audit opinions or withhold its consent to incorporate its opinion in the Registration Statement filed in connection with the Secondary Offering. A reasonable investigation would have uncovered material misrepresentations in Fuqi's audited financial statements for 2008, as well as the fact that the interim financial results reported in the 1Q 2009 10-Q were not prepared in accordance with GAAP.

## STONEFIELD DISREGARDED BLATANT
## RED FLAGS OF ACCOUNTING PROBLEMS

49.     The evidence shows that numerous red flags concerning the pervasive inadequacies of Fuqi's internal controls existed at the time of the Secondary Offering.

**1.      In March 2008, Fuqi's Weaknesses In Internal Controls
       and Lack of Proper Accounting Is Discussed With Stonefield**

50.     On March 18, 2008, Fuqi held an Audit Committee meeting attended by Lawrence Wan ("Wan"), a United States Certified Public Accountant who was then a Principal at Stonefield that was assigned to the Fuqi account, as well as the Company's CFO Wong, in which the deficiencies in the Company's internal controls were discussed at length. During the meeting, Hollander questioned Wan about communication between the Company and Stonefield, as well as problems that had been previously encountered during past audits. Wan reported that Stonefield could not get any information concerning the retail business counters in a timely manner because the Company's accounting department could not obtain that information.

51.     In addition, Hollander stated at that meeting that the Company had not notified the Board of the termination agreement with Beijing De Run Yi Sheng Jewelry Company, Ltd.  When questioned by Hollander about the termination of the counters, Wong indicated that there were no public announcements. Wan stated that no one had informed the auditor about the termination, and that all inventory from the five counters were included as part of the inventory in the Company's consolidated financial statement, as well as account payables, in the third quarter report filed in mid-November.  Thus, by the March 18, 2008 meeting, Wan was aware that the Company's public filings contained materially false and misleading information.

52.     Further evidencing Stonefield's knowledge or reckless disregard of the material misstatements in Fuqi's public filings, Wan stated that there may be additional internal control weaknesses that were not disclosed within the Company's 2008 10-K. Hollander indicated that he believed the Company's internal control weaknesses related to control over money, purchasing, and inventory, but that he was most concerned about the Company's internal control over financial statement reporting. Hollander stated that he considered the termination of the five retail counters to be a major and material transaction.  Because Stonefield did not receive the information regarding the Company's retail business in a timely manner, Wan stated that Stonefield would need to go back to do additional work on the audit for the retail businesss.

53.     At a March 26, 2008 Audit Committee meeting, attended by Wan, Hollander again expressed concern regarding the lack of communication between the Company and the Board regarding the termination of the five retail counters.  Chong stated that he realized that the lack of communication stemmed from his negligence and failure to communicate in a timely manner to the Board about the Company's decision. Chong further stated that as the CEO of a U.S.-listed Chinese company, he did not understand his obligations to the Company's shareholders. Wan stated during the meeting that he made changes in the updated report. Specifically, Wan indicated that he added the following paragraph: "[d]uring our audit, we noted certain significant transactions were incorrectly calculated or incorrectly recorded. Management reevaluated the transactions and recorded the necessary adjustments. We believed that these adjustments reflected significant deficiencies in the Company's internal control over accounting and financial reporting."

54.     During the meeting, Hollander stated that the Company should determine the real cause for the incorrect recording of significant transactions. Hollander added that Fuqi should determine whether the problem is with the capability of the accounting staff or whether the problem was caused by the lack of accounting staff.  Again demonstrating that Stonefield was aware of the material deficiencies in the Company's internal controls and public reporting, Wan stated that it appeared that Fuqi did not properly account for the new types of transactions and did not properly account for inventory every quarter.

55.     On March 27, 2008, Wong sent Brody an e-mail, which stated, in part:

> Dex [Dexter Fong] has created another issue to Fuqi today. Mr. Chong said he called and asked the Company don't issue sales invoices because Q1 sales have been too big ....  And I ask Mr. Chong, are you going to kill the business because of short term stock price. I said I don't need to sell my options in a short period and I see no point to kill the company to benefit myself.

> *        *        *

> But I recall that he [Dexter Fong] started this war after I refused to CHANGE the GP ratio. I had a big argument with the CEO that if the company wanted to change the numbers, asking someone else to sign off as CFO on the account. (So, today is the second time I refused to do creative accounting. Mr. Chong is not happy because Dex told him it is for the goodness of the stock price and I have totally no experience in that.)

> *        *        *

> Please be understood that I must defend his lies coz, basing on my experience, they may create harms to the company. I don't want to claim from our D&O.

56.     Brody responded to Wong's e-mail by asking "[a]re you saying Mr. Chong is trying to manipulate sales or are you saying that Mr. Chong is trying to turn away sales because they are not profitable or can't be handled because of the orders so far are so high?" Brody also asked: "[a]re you saying that Dex was trying to change the

bottom line GP number or are you saying he was trying to change the presentation of the component parts of GP?"

57.     Wong responded to Brody's e-mail by stating, in part, the following:

I had stopped Mr. Chong to manipulate sales by rejecting sales ....

He persuaded Mr. Chong to press me to negotiate with Lawrence to change to GP for Q4. But I rejected. Then he turned crazy.

Brody then replied to Wong's e-mail by asking "[i]s Mr. Chong not aware that he is **NOT** allowed to manipulate sales/earnings if that is indeed what you are suggesting?" (emphasis in original). Wong responded by stating that "Mr. Chong was fully explained about that."

58.     On March 28, 2008, Hollander sent an e-mail to Brody asking for input regarding the topics for the agenda for the Board meeting. Hollander suggested the following items for the agenda: (1) problem with communicating with accounting department - define responsibilities of CFO; (2) problem with communicating with Investor Relations department; (3) developing cooperation between IR and accounting; (4) communicating with independent members of the Board; and (5) requirement to obtain additional accounting personal to perform internal control functions and better current period reporting.

59.     Brody responded to Hollander's e-mail by suggesting the inclusion of additional topics for the Board meeting. Specifically, Brody recommended adding the following two items on the agenda: "6. Lack of adequate knowledge of US GAAP and SEC Requirements; 7. Losing creditability with investors between mis-communications, internal control deficiencies and not always executing on what was previously

communicated to the investment community." Additionally, Brody stated that "I also think we need to understand some of the details regarding Dex [Dexter Fong] supposedly violating FX requirements and some of the accurazations Fred [Wong] has made regarding Dexter."

> **2.      In May 2008, Stonefield Informs Fuqi About Significant Deficiencies in Its Internal Controls and About Its Lack of Cooperation With the Preparation of the Company's Financial Statements**

60.      On May 2, 2008, Wan sent an e-mail to Wong, Hollander, and Brody, stating:

> There are only 7 working days left before your 10Q is due. We still don't have all the schedules and required items to complete your review. We also don't have the 10Q to review at this point. The due date is Wednesday, May 14. I am sure there are many valid reasons for causing the delays. However I have said this many times that we need 2 weeks to complete our review process upon the receipts of the last piece of information. The lawyer, audit committee, Dexter all need to review this document before this document is to be filed. I would like to ask all of you please send us the required items for the quarterly review ASAP in order to for us to complete this process. It is the Company's responsibilities to file the 10Q not auditors. We have been calling everyday to follow up but it is really down to the wire. *If the turnaround time is this long without Temix, I can't imagine the time it will take with Temix after the acquisition. There is an immediate need to address these issues.*

61.      After Hollander responded to him, Wan replied that "[t]his has been recurring in the past few quarters and I was hoping things would get better when the Company is getting used to be a reporting public company but it does not appear to be the case." Wan added that "I think it is best to communicate this situation to the audit committee members so something can be done at the Company's end." Wan stated further that "[m]y impression is that the Company waited till the last possible minutes to send the info" and that "this means a major deficiency on the Company's financial reporting process."

62.     On May 26, 2008, Brody responded to an email from Hollander regarding a call with Chong by stating that "I think we should include Lawrence Wan (External Auditors) concerns regarding FUQI's ability to meet Audit & Reporting requirements after the Temix acquisition as it currently is having significant deficiencies noted by the External Auditors as it is prior to the acquisition."

63.     In an e-mail to Hollander and Brody dated May 28, 2008, Wong attached a memorandum regarding issues related to Fuqi's progress pursuant to SOX. Under a heading entitled "Lack of competent internal auditor," Wong told Hollander and Brody that although Chong had agreed to recruit an internal auditor for Fuqi, Chong still did not understand the need to pay a high salary to someone to monitor the Company's financial and internal controls. According to Wong, Chong stated that it is always the tradition for businessmen to neglect the need for financial and internal controls. Wong also stated that it was taking some time for the Company to educate Chong on the importance of having the Company comply with SOX.

**3.     In January 2009, Wong Stated That He Had No Control Over Fuqi's Accounting for the Company's Operations in Shenzhen**

64.     In an e-mail dated January 22, 2009 to undisclosed recipients, Wong wrote the following:

Dear all,

This is also update of closing.

US reporting team is working hard with Union Strength to get the closing done. Our target date to release 10K will be the last required date: Mar 16.

***However, we can't get 100% cooperation from local team, especially our new assistant finance manager can't get complete information for purchases applying to retails.*** Even Mr. Chong has helped to replace the

guy responsible to this part, some information being flown to the Finance Manager has been never provided in full for retail costing. ***No one, including Mr. Chong, can instruct the local Finance Manager to provide information in ANY GAAP requirements.*** He insists to deal with his PRC TAX formatted report ONLY. Again, we are effectively reworking the whole set of books basing on original vouchers.

Suli is also working hard from 404 angle to ensure local all original documentations must be tighten in our accounting records.

***I need to make it clear that, as of today, as I totally have no control over our general ledger works in Shenzhen***, I can only ensure team working on retail biz and US reporting will do the best to provide 404 complied report with quality ***but I can't have strong confidence to provide timely report to the auditors*** by now.

65.     In an e-mail dated February 4, 2009 from Wong to Hollander, Wong stated the following:

> ***Mr. Chong talked to me couple months ago that he felt he has difficulty in following all standards as a public co. CEO.*** Therefore he is persuading me to take his CEO role while he will remain as Chairman of BOD and Treasurer. It important for him to be the Treasurer because he is the one to deal with commodity . . . . I personally think that Mr. Chong can't make decision as I told him that I must remove at least 40% of his current management to some unimportant roles.

### 4.     In March 2009, Stonefield's Audit Report Highlights Fuqi's Failure to Maintain Adequate Internal Controls

66.     On March 29, 2009, Fuqi held an Audit Committee meeting. Hollander, Brody, Wong, Wan, Chief Operating Officer Lie Xi Zhuang, and Executive Vice President Charlene Hua ("Hua") participated in the meeting.  During the meeting, Wan stated that pursuant to the terms of the Temix transaction, Fuqi was required to remit 80% of the amount of the transaction upon closing and the remaining amount within six months after the closing of the transaction. Wan stated further that as of December 31, 2008, the Company had remitted approximately $7.3 million to Chujian Huang and that on March 21, 2009, Huang granted a verbal extension to the Company to remit the

remaining payments by a date which will be agreed upon later between the two parties. Wan also stated that the adjustments that the Company made in the current year were almost double than those made in the prior year, which he thought may have been caused by the Company's systems that generated problems in the costing or incorrect analysis of accounts. Wan also stated that there were reports regarding deficiencies from the auditor to the audit committee and management and significant difficulties encountered in performing and completing the audit.

67.     Additionally, on March 30, 2009, Stonefield sent a report to the members of Fuqi's Audit Committee that contained the Company's consolidated financial statements for the year ended December 31, 2008. In the report, Stonefield stated that "[b]ased on our testing, we found 26 control deficiencies which alone do not qualify as significant deficiencies or material weaknesses. 3 significant deficiencies were identified of which 2 of them alone were significant deficiency while the third one combining with other deficiencies qualify as a significant deficiency. 2 material weaknesses were identified of which both of the deficiencies alone qualify as material weaknesses." Specifically, the report stated that:

- The Company did not maintain effective control over complex and non-routine transactions and estimation processes, due to inadequate review of accounting procedures, insufficient analysis, and improper application of relevant accounting pronouncements. This significant deficiency resulted in adjustments to several significant accounts. The areas being most affected include allowance for doubtful accounts, and inventory valuation and reserve;

- The Company's valuation methodology for the securities issued related to the Temix acquisition was incorrect. In addition, the Company did not provide accurate and complete information to the outside valuation firm in regards with the SF AS 141 purchase price allocation. This significant deficiency resulted in inaccurate

information being disclosed in the financial statements related to the Temix acquisition. Such errors should have been detected if the allocation report was properly reviewed;

- The Company did not maintain an effective costing system for its retail transactions. This significant deficiency resulted in incorrect costing on its inventories and incorrect cost of sales on both wholesale and retail's segments' financial statements.

68.    The report also stated that the following significant difficulties were encountered in performing and completing the audit:

- The Company could not locate certain supporting documents for its inventory purchases;

- The Company did not maintain an effective system on inventory costing for its retail transactions which created numerous delays in providing the inventory costing records and supports during the audit; and

- The Company was unable to provide timely information to support the information disclosed in the 10K. There were many errors or outdated information contained in the Form 10K which caused delays in the review process.

69.    Additionally, the report stated that there were numerous clerical errors and inaccurate disclosures contained in the Company's Form 10-Q that were not detected by the Company.

70.    In e-mails dated March 30, 2009 in connection with Fuqi's 2008 10-K and the Company's decision not to disclose the significant deficiencies, Wan stated that the Company purportedly disclosed the significant deficiencies in 2007 and that Fuqi has decided not to do so in 2008. Wan stated further that it is a question for Ahn Tran ("Tran") at K&L Gates "to see how to reword it. ***The current language will make people to believe there are no significant deficiencies for 2008.***" In another e-mail, Wan stated that "[o]ne thing I forgot make you aware of during the call. There were ***3 significant***

***deficiencies*** which we identified during the IC audit and the Company made the determination not to disclose them in the 10K. It is not mandatory. The Company did disclose SD last year and the year before. I just want to make you and Eileen [Brody] aware of it."

71.     In a report from Stonefie1d to Fuqi's audit committee for the three months ended March 31, 2009, Stonefie1d reported on difficulties it encountered in performing a review of the Company's financial statements. Specifically, the report stated the following:

- The Company did not provide the information in accordance to the scheduled time table which caused delays to the review process;

- During our review process, we were unable to obtain timely responses to our inquiries and questions related to the review which caused delays to the review process; and

- The draft of the financial statements and notes to the financial statements and information included in the Form 10Q document contain numerous errors and outdated information which required a lot of reviews.

72.     Finally, at a meeting with the Audit Committee concerning the Company's progress with respect to compliance with SOX on July 30, 2009 (the same day that Fuqi filed its Final Prospectus Supplement with the SEC in connection with the Offering), Hollander, the Chair of Fuqi's Audit Committee, stated: "***the Company has no internal control. This is a horrible situation.***"

**5.     The Truth Is Revealed Concerning Fuqi's
        <u>Pervasive Internal Control Deficiencies</u>**

73.     On March 16, 2010, the Company stunned the market when it issued a press release announcing, among other things, that its Audit Committee concluded that

the Company's previously issued financial statements for the first three quarters of 2009

"***should not be relied upon due to an error in the accounting of inventory and cost of sales.***" As the Company further stated on March 16, 2010:

> The Company has been conducting an assessment of its internal controls as of December 31, 2009 in accordance with the Company's Sarbanes-Oxley Act compliance procedures. Although the Company's assessment procedures are not yet complete, the Company believes that ***at least one of the identified deficiencies related to its 2009 Sarbanes-Oxley Section 404 compliance audit, thus far, constitutes a material weakness, including but not limited to the Company's period-end closing process as of December 31, 2009.*** The complete and final results of the Company's assessment of its internal controls will be disclosed in its Annual Report on Form 10-K for the year ended December 31, 2009.
>
> As a result of the findings of the 2009 Sarbanes-Oxley Section 404 audit, thus far, the Company identified certain accounting errors that are expected to have a material impact on the previously issued quarterly financial statements for the first three quarters of 2009 . . . . [I]t is expected that as a result of the accounting errors, the cost of sales for each of the periods were understated and gross profit and net income, as a result, were accordingly overstated. Based on the Company's latest estimate, the earnings per share included in the previously issued financial statements for the nine months ended September 30, 2009 were overstated by approximately $0.15-$0.19 per share based on approximately 23.0 million weighted average number of shares for the nine months ended September 30, 2009 .... Due to the Company's ongoing internal analysis, the Company is currently unable to provide estimated results of operations for the year ended December 31, 2009.

74.     As a consequence of the foregoing disclosures, the price of Fuqi common stock dropped more than 35% on the first trading day following the disclosures, on heavy trading volume of 17.3 million shares.

75.     The pervasiveness of these false and misleading accounting statements would have been nearly impossible for Stonefield to overlook based on even the most basic and fundamental review that it was required to perform as part of its AU 711

subsequent event procedures leading up to the effective date of the Registration Statement of the Secondary Offering.

## COUNT I

### (Violation of Section 11 of the Securities Act)

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein only to the extent, however, that such allegations do not allege fraud, scienter or the intent of Stonefield or the non-parties to defraud Plaintiff or members of the Class, but instead allege that Defendant acted negligently. This count is predicated upon strict liability for making false and materially misleading statements in the Registration Statement and Prospectus issued in connection therewith.

77.     This claim is asserted by Plaintiff against Stonefield by, and on behalf of, persons who acquired shares of the Company's common stock pursuant to or traceable to the Registration Statement and Prospectus issued in connection with the Company's July 22, 2009 Secondary Offering.  PR Group member, the Puerto Rico Government Judiciary Employees Retirement System Administration, purchased Fuqi stock pursuant or traceable to the Company's Secondary Offering.

78.     Pursuant to AU 711. 03, Stonefield must show that it "had after reasonable investigation, reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  One of the unique responsibilities related to the auditor's consent to the inclusion of an audit report in a registration statement is that the decision to consent should be made in light of the circumstances as of the effective

date.  Accordingly, Stonefield was required to view the continuing validity of the opinion expressed at an earlier date from the perspective of the circumstances known as of the effective date: "an auditor should extend his procedures with respect to subsequent events from the date of his audit report up to the effective date . . . ."  AU 711.10.

79.     As alleged above, by the effective date of the Registration Statement issued in connection with the Secondary Offering, Stonefield was well aware of numerous red flags indicating that the Company's previously filed financial statements were materially false and misleading and, therefore, unreliable.  Specifically, based on his attendance at a March 18, 2008 Audit Committee meeting, Stonefield partner Lawrence Wan knew that Fuqi CEO, Chong, had failed to advise the Board or Stonefield of the termination of Fuqi's agreement with Beijing De Run Yi Sheng Jewelry Company, Ltd. and the closing of jewelry counters, and that inventory from the counters was still improperly shown in Fuqi's consolidated financial statement, as well as account payables, in the third quarter report filed in mid-November.  In addition, Wan was present when, at that same meeting, Hollander, chair of the Audit Committee stated that that he believed the Company's internal control weaknesses related to control over money, purchasing, and inventory.

80.     In addition, based on the lack of internal controls, Stonefield knew, or should have known that the Company's 1Q 2009 10-Q contained materially false and misleading financial statements that were not prepared in accordance with GAAP.  Not only was  Stonefield obligated to review the 1Q 2009 10-Q which was filed with the SEC prior to effective date of the Registration Statement and incorporated by reference therein, pursuant to AU 711.10, but a May 5, 2009 email from Stonefield Partner Wan to,

among others, Audit Committee members Hollander and Brody, showed that Stonefield reviewed and approved the 2009 Form 10-Q prior to its filing:

> Hi Vic and the rest of the team,
>
> We need to get absolutely 100% of everything related to the review today (including all the PBC files and pending/open items resolved) *in order to complete our review and sign off by May 11. . . . I understand everyone including myself would like to file this 10Q in accordance with the original deadline,* and everyone works really hard to get to this stage. However time is running out and we are being pushed against the wall. The latest I have to send all my file *to our concurring partner for her review is Thursday*.  We still have lots of internal checklists and review procedures to perform once we receive your schedules/documents tomorrow.  Therefore, if we don't have everything today, I think we should plan on filing the extension that will give us till May18.

The Company's 2008 Form 10-K also indicated that Stonefield reviewed Fuqi's interim consolidated financial statements as part of its engagement: "Audit Fees consist of fees billed for professional services rendered for the audit of the Company's consolidated annual financial statements and *review of the interim consolidated financial statements included in quarterly reports* and services that are normally provided by Stonefield Josephson, Inc. in connection with statutory and regulatory filings or engagements."

81.    For the purposes of issuing consent in a registration statement, AU 711 requires that an auditor view the continuing validity of an audit opinion expressed at an earlier date from the perspective of the circumstances known at the effective date. As a result, based on the pervasive internal control deficiencies that existed as of the effective date of the Registration Statement in the Secondary Offering, as well as the materially false and misleading financial statements contained in the 1Q 2009 10-Q,  Stonefield was required to modify its previously issued FY 2008 audit opinion or to withhold its consent.

82.     AU 711.13 describes the auditor's responsibilities if the auditor discovers or becomes aware that an unaudited financial statement or unaudited interim financial information, such as the 1Q 2009 10-Q, presented or incorporated by reference in a registration statement that is not in conformity with GAAP:

> If an accountant concludes on the basis of facts known to him that unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement are not in conformity with generally accepted accounting principles, he should insist on appropriate revision.

83.     AICPA Professional Standards, Statements on Auditing Standards No. 37, § 711 (Am. Inst. Of Certified Pub. Accountants 1981), indicates that even if an appropriate revision is made, "the accountant should consider, probably with the advice of legal counsel, withholding his consent to the use of his report on the audited financial statements in the registration statement."

84.     Accordingly, under both professional auditing standard AU 711, and AICPA Professional Standards, Statements on Auditing Standards No. 37, § 711 (Am. Inst. Of Certified Pub. Accountants 1981),  Stonefield had a duty to either modify its audit opinion, or withhold its consent to the incorporation of its opinion in the Registration Statement filed in connection with the Secondary Offering.

85.     However, Stonefield failed to either modify it audit opinion or withhold its consent.  Therefore, Stonefield's 2008 audit opinion was materially false and misleading at the time that Stonefield consented to its use in the Secondary Offering.

86.     Stonefield, therefore, participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, *inter alia*, the facts

set forth above. By reason of the conduct herein alleged, Stonefield violated Section 11 of the Securities Act.

87.     As a direct and proximate result of Stonefield's acts and omissions in violation of the Securities Act, the market price of Fuqi's common stock sold in the Secondary Offering was artificially inflated, and Plaintiff and the Class suffered substantial damage in connection with their purchase of Fuqi's common stock pursuant to the Registration Statement and Prospectus.

88.     At the times they obtained their shares of Fuqi stock, Plaintiff and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

89.     As tolled, this action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus which should have been made through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

90.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendant named in this Count.

## EXCHANGE ACT ALLEGATIONS

91.     Plaintiff repeats and realleges each and every allegation contained above by reference as though set forth in full herein.

92.     As alleged above, Stonefield consented to the incorporation of its reports in the Registration Statement issued in connection with the Secondary Offering.

93.     At the time of the Registration Statement, the Company's internal controls were virtually nonexistent.

94.     As noted above, under AU 711, if an auditor discovers or becomes aware of information that may have existed at the time of an audit report that might have affected the report, the auditor, pursuant to AU 560-61, should ensure that proper adjustments or disclosures are made, or the previously issued report should be withdrawn.

95.     AU 711 imposes a similar responsibility for any unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement, such as the 1Q 2009 10-Q, that is not in conformity with GAAP.

96.     On March 16, 2010, Fuqi announced that the Company's previously issued financial statements for the first three quarters of 2009, including those for the quarter ended March 31, 2009 in the 1Q 2009 10-Q, which were incorporated by reference in the July 22, 2009 Registration Statement "should not be relied upon due to an error in the accounting of inventory and cost of sales."  Stonefield's review and approval of the 1Q 2009 10-Q (as indicated in the May 5, 2009 email from Stonefield Partner Wan to Defendants Hollander and Brody), as well as numerous "red flags" that did, or should have, put Stonefield on notice that the unaudited interim financial statements in the 1Q 2009 10-Q were not prepared in accordance with GAAP.  In fact, in a March 30, 2009 letter to Defendant Chong, long before Fuqi announced that the 1Q 2009 10-Q should no longer be relied upon, Stonefield specifically identified problems relating to inventory and cost of sales as a significant internal control deficiency:

> The Company calculated the inventory cost incorrectly and the Company did not detect the miscalculation during the review of the inventory

valuation.  ***This resulted in misstatements in the inventory and cost of sales.*** (alone control deficiency but in combination as significant deficiency)

97.     Therefore, Stonefield should have required appropriate revisions in the 1Q 2009 Form 10-Q, or modified its audit report to describe the failure to conform to GAAP in the unaudited interim financial information pursuant to AU 711.13:

> If an accountant concludes on the basis of facts known to him that unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement are not in conformity with generally accepted accounting principles, he should insist on appropriate revision. Failing that, if the accountant has not reported on a review of the unaudited financial statements or interim financial information, he should modify his report on the audited financial statements to describe the departure from generally accepted accounting principles contained in the unaudited financial statements or interim financial information.

As noted above, even if the revisions were made, Stonefield should have considered whether to withdraw its consent to include it audit opinion in the Registration Statement. AICPA Professional Standards, Statements on Auditing Standards No. 37, § 711 (Am. Inst. Of Certified Pub. Accountants 1981).

98.     The Company's internal controls were so ineffective that shortly after the Registration Statement, the Company's internal controls failed to prevent Chong from unilaterally engaging in improper cash transfers.  Chong was permitted to cause Fuqi to engage in approximately 50 unauthorized cash transfers, totaling approximately $135 million, to three unrelated entities between September 11, 2009 through November 24, 2010.  The cash transfers, which appeared to be unauthorized by the Company's Board, were done without written agreements or repayment terms.

99.     Without knowing about the Company's problems, various members of the financial media started to tout the Company following issuance of the 1Q 2009 10-Q. For example, on May 26, 2009, *Motley Fool* identified Fuqi as one of five companies on its *Wall Street Buy List*.

100.     On January 12, 2010, as a result of robust financial results reported by Fuqi during the Class Period, *The Street.com* Senior Contributor Eric Jackson published an article about the Company entitled, *Score Some Beijing Bling with Fuqi*.   In that article, Jackson wrote:

> Fuqi had a great 2009, with the share price going from a 52-week low of $3 to well over $32 a couple months back. Operationally, the company continues to grow its top and bottom lines.
>
> *  *  *
>
> . . . [A recent stock price] drop represented a great opportunity to get in the stock. Factoring in the positive moves this week, Fuqi's share price is back close to $21. With the relatively modest valuation and the expected red-hot growth in China to continue, however, Fuqi temporarily appears to be still on sale, so a return trip to over $30 a share is not an unreasonable expectation over the next eight months, assuming that the company continues to execute as it did last year.
>
> The current quarter's earnings announcement should come out next month. If Fuqi meets expectations for the fourth quarter and can show that its growth rate is intact, investors should regain confidence in the stock.

101.     Despite the numerous red flags described above, having consented to the incorporation by reference of its FY 2008 audit opinion in the Registration Statement, Stonefield knowingly or with reckless disregard, failed to modify its opinion to reflect the Company's failure to conform to GAAP in the 1Q 2009 10-Q, the falsity of the representations made in the certifications executed by Chong and Wong pursuant to § 302(a) of Sarbanes-Oxley in connection with the 1Q 2009 10-Q, or address the endemic internal control deficiencies at Fuqi.

## THE TRUTH IS REVEALED

102.    On November 9, 2009, the truth was partially disclosed after the Company reported its third quarter results.  While Fuqi generally reported results in conformity with estimates, it only met those estimates through an unusually high recognition of high margin original design manufacturing revenue, which had gross margins higher than the Company's historical gross margins for its wholesale business.  Thus, the quality of Fuqi's earnings was questioned.  On that same day, analyst Merriman Curhan Ford issued a report entitled "Fuqi International Reports Mixed 3Q09 Results; Slower Core Growth Boosted By Significant ODM Revenues; Need To See 4Q/FFY10 Rebound In Trends." Noting that Fuqi's wholesale business growth had declined 10%, the report stated:

### Investment Conclusion

In our opinion, FUQI International's strong brand and established wholesale distribution coupled with its recent entry into the higher margin retail channel should help it take increasing market share of China's jewelry market. That being said, we are slightly more cautious on the near-term wholesale growth profile given the ODM margin boost in 3Q and need to see a return to core growth in 4Q to remain constructive on the shares — along with a return to more normalized retail gross margins. FY10 revenue growth should remain in fact although EPS growth will be constrained due to the one-time benefits this year. We are reducing our P/E multiple to 12-15x (from 15-18x) on our FY10 EPS estimate, yielding a potential valuation range of $27.75-34.50.

### Summary

• **FUQI reported mixed 3Q results** with overall revenues of $127.2M vs. our estimate of $129.5M and EPS of $0.73 vs. our street-high estimate of $0.51. Overall blended gross margins of 23.5% came in above our 16.0% estimate.

• **ODM orders provided the quarterly boost.** FUQI generated $19.0M in wholesale revenues from original design manufacturing (ODM) orders vs. only $1.0M in 3Q09. Excluding these orders, wholesale growth slowed to around 10%.  In addition, management noted that the gross margin on the ODM revenues are at least 2x the margins on traditional wholesale

revenues (although by our calculations the benefit had to be much greater than that).

**• Concerned about lower-quality revenues.** We view these ODM orders as lower quality than core jewelry sales and need to monitor the trend to make sure that this does not continue. At a minimum, FUQI management made good use of extra capacity to land high-margin business, but this is not the core jewelry business for which investors are involved in FUQI shares.

**• Retail margins below expectations.** Retail margins of 22.6% came in below our 31.5% estimate and the 38% margin last year. Management attributed this to product mix with more lower-margin platinum products (investing) instead of gold/gemstone products (gift-giving). We expect margins to rebound in 4Q with more gift-giving holidays vs. none in 3Q.

**• Core growth looks stable for 4Q/FY10.** FUQI guided to 4Q09 revenues of $182-191M vs. our estimate of $179M without the benefit of any ODM orders and FY10 wholesale growth of 25%+ vs. our assumption of 25% growth.

**• We are lowering our FY10 EPS estimate** with an assumption of a more conservative blended gross margin profile next year (15.2% vs. our previous assumption of 16.1%). Although the FY10 EPS growth rate of 3.5% looks minimal, we believe the actual EPS growth (excluding commodity and ODM benefits) would be closer to 25-30% in FY10.

103.    Following the announcement by Fuqi and comments about its results, including the Merriman Curhan Ford report, the price of Fuqi stock dropped 17.79%, or $4.15 per share, to close at $9.18 per share on unusually heavy volume.

104.    On March 16, 2010, the Company stunned the market when it issued a press release announcing:

On March 11, 2010, the management and the Audit Committee of the Company concluded that the Company's previously issued financial statements

(i)   as of and for the three months ended March 31, 2009 as included in the Company's Quarterly Report on Form 10-Q filed with the Securities and Exchange Commission (the "Commission") on May 15, 2009 (the "First Quarter 10-Q"),

(ii)   as of and for the three and six months ended June 30, 2009 as included in the Company's Quarterly(ii)   as of and for the three and six months ended June 30, 2009 as included in the Company's Quarterly Report on Form 10-Q filed with the Commission on August 6, 2009 (the "Second Quarter 10-Q"), and

(iii)   as of and for the three and nine months ended September 30, 2009 as included in the Company's Quarterly Report on Form 10-Q filed with the Commission on November 9, 2009 (the "Third Quarter 10-Q", and collectively with the First Quarter 10-Q and the Second Quarter 10-Q, the "Filings"), ***should not be relied upon due to an error in the accounting of inventory and cost of sales***.

105.   As the Company further stated on March 16, 2010:

The Company has been conducting an assessment of its internal controls as of December 31, 2009 in accordance with the Company's Sarbanes-Oxley Act compliance procedures. Although the Company's assessment procedures are not yet complete, ***the Company believes that at least one of the identified deficiencies related to its 2009 Sarbanes-Oxley Section 404 compliance audit, thus far, constitutes a material weakness, including but not limited to the Company's period-end closing process as of December 31, 2009.*** The complete and final results of the Company's assessment of its internal controls will be disclosed in its Annual Report on Form 10-K for the year ended December 31, 2009.

As a result of the findings of the 2009 Sarbanes-Oxley Section 404 audit, thus far, the Company identified certain accounting errors that are expected to have a material impact on the previously issued quarterly financial statements for the first three quarters of 2009. Management and the accounting personnel require additional time to evaluate such effects on the previously filed quarterly financial statements of 2009. Because the review is still underway, the Company is unable to accurately estimate at this time the impacts on the Company's interim financial statements for the first three quarters of 2009. However, it is expected that as a result of the accounting errors, the cost of sales for each of the periods were understated and gross profit and net income, as a result, were accordingly overstated. Based on the Company's latest estimate, the earnings per share included in the previously issued financial statements for the nine months ended September 30, 2009 were overstated by approximately $0.15-$0.19 per share based on approximately 23.0 million weighted average number of shares for the nine months ended September 30, 2009. The foregoing estimate is based only upon preliminary information available to the Company as of the date of this press release, is subject to adjustment in connection with its ongoing review, and has not been audited by its independent registered public accounting firm. Due to the

Company's ongoing internal analysis, the Company is currently unable to provide estimated results of operations for the year ended December 31, 2009. The Company will file its Annual Report on Form 10-K as soon as possible; however, there can be no assurance that the report will be filed within the extended 15 day deadline.

106.    As a consequence of the foregoing disclosures, the price of Fuqi common stock dropped more than 35%, from a close of $19.00 per share on March 16, 2010, prior to the disclosures, to a close of $11.90 per share on March 17, 2010, the first trading day following the disclosures, on heavy trading volume of 17.3 million shares.

107.    On or about September 8, 2010, Fuqi announced that it "was notified recently by the SEC of a formal investigation, and has received a subpoena from the SEC for certain documents, relating to its failure to timely file required periodic reports, as well as other matters."

108.    On March 28, 2011, Fuqi disclosed that the Company had made certain unauthorized cash transfers of $135 million that were being investigated by its Audit Committee.   The transfers, which were authorized by Chong, were stated not to be authorized by the Company's Board, and were not supported by any written agreements or repayment terms.   The transfers were purportedly made at the request of Fuqi's bank with no *quid pro quo*, and were purportedly made to strengthen the relationship between the bank and Fuqi.   The Company stated that all monies that were paid as part of the transfers had been repaid to Fuqi.

109.    On July 1, 2013, the SEC announced that Fuqi and Chong had agreed to settle false and misleading statement charges under § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, relating to the above-referenced cash transfers that had been filed by the SEC in the action *U.S. Securities and Exchange Commission v.*

*Fuqi International, Inc. and Yu Kwai Chong*, Case No. 13-cv-995 (RC) (D.D.C.).   Fuqi and Chong consented to the entry of a final judgment that: (i) permanently enjoins them from future violations of the federal securities laws; (ii) orders Fuqi and Chong to pay civil penalties of $1 million and $150,000, respectively; and (iii) bars Chong from serving as an officer and director for five years.  Final judgments were entered against Fuqi and Chong on August 7, 2013, and a corrected final judgment against Chong on October 3, 2013.

## LOSS CAUSATION

110.   Defendant's wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  As a result of the open, well-developed, and efficient market for Fuqi's stock, the prices of the Company's common stock fell when the misrepresentations made to the investing community, including the disclosure of materially false and misleading financial statements and problems with its internal controls, were finally disclosed to investors and the artificial inflation was removed over time from the stock price.  As a result, Plaintiffs and the Class suffered damages.

111.   The false claims concerning Fuqi's financial statements, operating results and internal controls caused and maintained artificial inflation in the Company's stock price throughout the Class Period and until the truth was disclosed to the market.

112.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendant consented to the incorporation of

its 2008 audit opinion in Fuqi's July 2009 Registration Statement, and failed to conduct any reasonable investigation concerning a series of materially false or misleading statements about Fuqi's costs of sales, gross profits and net income, despite the numerous red flags concerning the pervasive inadequate internal controls at the Company. The incorporation of Stonefield's 2008 audit opinion in the 2009 Registration Statement and the failure to conduct any reasonable investigation, had the cause and effect of permitting materially false and misleading statements to be included in the 2009 Registration Statement, creating in the market an unrealistically positive assessment of Fuqi and its financial well-being, business relationships, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. This, in turn, resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

113.   During the Class Period, Defendant's consent to include the 2008 audit opinion in the Registration Statement, as well as and its failure to conduct any reasonable investigation, resulted in the inclusion of the above-referenced materially false and misleading statements and omissions causing Plaintiff and other members of the Class to purchase the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. The price of Fuqi common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## ADDITIONAL SCIENTER ALLEGATIONS

114.   With respect to Plaintiff's Exchange Act claims as alleged herein, Stonefield  acted with scienter because it: (i) knew, or recklessly disregarded, that the Company had pervasive internal control problems such that the financial statements issued by the Company were materially false and misleading; (ii) knew that such statements would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Stonefield participated in internal meetings with the Company's Audit Committee and was privy to Fuqi's internal records and documents. By virtue of its receipt of information reflecting the true facts regarding the inadequate internal controls at Fuqi, their control over, and/or receipt and/or modification of Fuqi's allegedly materially misleading misstatements and/or their audit work with the Company which made them privy to confidential proprietary information concerning Fuqi, they participated in the fraudulent scheme alleged herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE AND
### FRAUD ON THE MARKET DOCTRINE

115.   At all relevant times, the market for Fuqi's securities was an efficient, well-developed and open market.  As a result of these materially false and misleading statements and failures to disclose material information, Fuqi's stock traded at artificially inflated prices during the Class Period.   Plaintiff and other members of the Class purchased or otherwise acquired Fuqi stock relying upon the integrity of the market price of the Company's stock and market information related to the Company.  The efficiency of the market for Fuqi's stock is demonstrated by the following reasons, among others:

46

(a)     Fuqi's stock was traded on the NASDAQ exchange with trading volume in the hundreds of thousands and with millions of shares traded throughout the Class Period;

(b)     As a regulated issuer, Fuqi filed periodic public reports with the SEC and the NASDAQ;

(c)     Fuqi regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Fuqi was followed by securities analysts during the Class Period who issued reports which were publicly available and entered the public marketplace.

116.    As a result of the foregoing, the market for Fuqi's common stock promptly digested current information regarding Fuqi from all publicly-available sources and reflected such information in Fuqi's stock price.  During the Class Period, Stonefield materially misled the investing public, thereby inflating the price of Fuqi securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the statements not false and misleading.  These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, and operations.

117.   At all relevant times, the material misrepresentations and omissions were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Stonefield made, or caused to be made, or acquiesced in others making a series of materially false or misleading statements about Fuqi's business, accounting, and financial results.   The material misstatements and omissions described herein had the cause and effect of creating in the market an unrealistically positive assessment of Fuqi and its business and operations, thus causing the Company's stock to be overvalued and artificially inflated at all relevant times.   The materially false and misleading statements issued during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages alleged when the truth was revealed.  Under these circumstances, all purchasers of Fuqi's common stock during the Class Period suffered similar injury through their purchase of Fuqi's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

118.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Stonefield is liable for those false

forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved when Stonefield knew that those statements were false when made.

**COUNT II**

**(Violation of Section 10(b) of the Exchange Act
And SEC Rule 10b-5 Promulgated Thereunder)**

119.    Plaintiff repeats and realleges each and every allegation contained above by reference as though set forth in full herein.

120.    During the Class Period, Stonefield and others carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Fuqi common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Stonefield took the actions set forth herein.

121.    Stonefield: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock, which maintained artificially high market prices for Fuqi common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Stonefield is sued as primary participants in the wrongful and illegal conduct charged herein.

122.   Stonefield directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Fuqi's financial results, business relationships, and prospects, as specified herein.

123.   Stonefield employed devices, schemes and artifices to defraud, while in possession of material, adverse, non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fuqi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Fuqi, its accounting and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Fuqi's common stock during the Class Period.

124.   Stonefield's primary liability arises from the following facts: (i) Stonefield served as the Company's independent outside auditor during the Class Period; (ii) by virtue of their responsibilities and activities as Fuqi's outside auditor, Stonefield was privy to data about the adequacy of the Company's internal controls, and its accounting practices, as well as its financial results; and (iii) Stonefield, by virtue of its review and approval of the 1Q 2009 10-Q, was aware of the dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

125.    Stonefield had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such actions and omissions were done knowingly or recklessly and for the purpose and effect of supporting the artificially inflated price of Fuqi's common stock. As demonstrated by their material misstatements about the Company's financial results during the Class Period, Stonefield, if it did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from conducting any reasonable investigation to discover whether those statements were false or misleading.

126.    Pursuant to AU 711, Stonefield had a duty to conduct a reasonable investigation following the incorporation of the Company's 1Q 2009 10-Q in the Registration Statement,  to determine if any unaudited financial statements or unaudited interim financial information presented or incorporated by reference in a registration statement that are not in conformity with GAAP.

127.    On March 16, 2010, Fuqi announced that the Company's previously issued financial statements for the first three quarters of 2009, including those for the quarter ended March 31, 2009 in the 1Q 2009 10-Q, which were incorporated by reference in the July 22, 2009 Registration Statement "should not be relied upon due to an error in the accounting of inventory and cost of sales."  As described above, Stonefield actually reviewed and approved Fuqi's 1Q 2009 10-Q despite the numerous "red flags" that did, or should have, put Stonefield on notice that the unaudited interim financial statements in the 1Q 2009 10-Q were not prepared in accordance with GAAP.  As early

as March 2009, Stonefield had identified problems with the Company's inventory and cost of sales as a significant internal control deficiency.

128.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fuqi's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Fuqi's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements specified above, or upon the integrity of the market in which the common stock traded, and/or in the absence of material, adverse information that was known to or recklessly disregarded by Stonefield, but not disclosed in public statements by them during the Class Period, Plaintiff and the other members of the Class acquired Fuqi's common stock during the Class Period at artificially high prices and were damaged thereby.

129.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's inadequate internal controls and financial results, which were not disclosed by Fuqi, Stonefield or others, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Fuqi common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

130.   By virtue of the foregoing, Stonefield has violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

131.    As a direct and proximate result of Stonefield's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding damages in favor of Plaintiff and the other Class members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  October 27, 2016          **ABRAHAM, FRUCHTER & TWERSKY LLP**

By: /s/ Mitchell M.Z. Twersky

Mitchell M.Z. Twersky (MT-6739)
Lawrence D. Levit (LL-9507)
One Penn Plaza, Suite 2805
New York, NY 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655
mtwersky@aftlaw.com
llevit@aftlaw.com

*Lead Counsel for Plaintiff the PR Group*

**RIGRODSKY & LONG, P.A.**
Timothy J. MacFall
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302)654-7530
TJM@rl-legal.com

*Attorneys for Plaintiff Sandra Redfern*

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Ex Kano S. Sams II
Robert V. Prongay
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
rprongay@glancylaw.com
Esams@glancylaw.com

*Attorneys for Plaintiffs Craig B. Laub and
J.D. Pisut*